UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07 CIV 8765

| | |
|---|---|
| SHIRA MCKINLAY, on behalf of herself and all others similarly situated, | No. |
| Plaintiff, | |
| -against- | Jury Trial Demanded |
| THE BANK OF NEW YORK and THE BANK OF NEW YORK MELLON CORPORATION, | CLASS ACTION COMPLAINT |
| Defendants. | |

Plaintiff, individually and on behalf of the Class described below, by her undersigned attorneys, upon information and belief based upon, *inter alia*, the investigation of counsel, except as to those allegations applicable to Plaintiff that are all alleged upon personal knowledge, alleges as follows:

## NATURE OF ACTION

1. This is a class action brought by a client of non-party Sentinel Management Group, Inc. ("Sentinel") on behalf of all such clients (the "Class") whose assets were managed by Sentinel during the period from January 1, 2004 through August 13, 2007 (the "Class Period"), and for whom the defendants Bank of New York and Bank of New York Mellon Corporation (collectively "BNY") functioned as custodian of their assets (the "Class").

2. Sentinel is a registered investment adviser that manages investments for various types of clients, including futures commission merchants, commodity pool operators, hedge fund managers, commodity trading advisors, currency traders, corporate treasurers, and high net-worth individuals.

3. BNY, in its role as Sentinel's custodian bank, had custody of all account assets of Sentinel's clients throughout the Class Period.

4. Throughout the Class Period, Sentinel stated on its website that client assets were held in a separate custodial account at a third party custodian bank "under the protection of U.S. fiduciary law."

5. In fact, during the Class Period, Sentinel transferred at least $460 million in securities from client investment accounts at BNY to Sentinel's proprietary "House Account," also maintained at BNY.

6. Sentinel further used its clients' assets to obtain a credit line that at one point reached $500 million, as well as additional leveraged financing, all from BNY.

7. On August 13, 2007, Sentinel sent a letter to its clients informing them that it was halting all redemptions because of the "liquidity crisis" in the credit markets. On or about that same date, it defaulted on the credit line and/or other debts it owed to BNY.

8. On August 17, 2007, Plaintiff forwarded to Sentinel a letter terminating her investment management account and revoking any power of attorney she had granted to invest her assets.

9. On or about August 17, BNY informed Sentinel that it had seized and intended to sell hundreds of millions of dollars in assets that had been pledged as collateral for the credit BNY had extended to Sentinel. The assets in question included securities owned by Sentinel's clients that had been improperly transferred into Sentinel's House Account.

10. On August 17, 2007, Sentinel filed for protection under Chapter 11 of the U.S. Bankruptcy Code.

11. On August 20, 2007, the United States Securities and Exchange Commission ("SEC") filed a complaint against Sentinel for violations of the Investment Advisers Act of 1940 and commenced an investigation. According to a Barron's article dated September 3, 2007, the

SEC investigators as of that date had found only $92 million of the $800 million in assets that had been in one are of the Sentinel client accounts and from which assets had been improperly transferred. The August 13 final account statements that Plaintiff and other Class members received from Sentinel did not reflect the true state of their accounts; as the SEC investigation has shown, nearly 90% of the assets had been improperly transferred out of the client accounts during the Class Period.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over the claims asserted herein pursuant to the Class Action Fairness Act and 28 U.S.C. § 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members of the Class of plaintiffs are citizens of states different from BNY's state of citizenship.

13. Venue is proper under 28 U.S.C. § 1391(b) and (c), because BNY and Bank of New York Mellon both maintain their corporate headquarters within this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

## PARTIES

14. Plaintiff Shira McKinlay ("Plaintiff") is an individual residing in the state of Florida.

15. Plaintiff maintained investment account no. SBM001-USD-001, which account was managed by Sentinel. The assets invested in the account were at all relevant times held by custodian bank BNY. On August 13, 2007 Plaintiff received an account statement from Sentinel purportedly showing assets having a value of $131,075.66.

16. Defendant Bank of New York is a federally chartered bank, with its headquarters located in New York, New York, and is the principal subsidiary of defendant Bank of New York Mellon.

17. Defendant Bank of New York Mellon is a corporation organized and existing under the laws of the State of Delaware, with its corporate headquarters located in New York, New York, and is the corporate parent of defendant Bank of New York.

18. At all relevant times, BNY had custody of the Class members assets that were managed by Sentinel.

## CLASS ACTION ALLEGATIONS

19. This action is brought as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all entities that maintained investment accounts managed by Sentinel and for whom BNY functioned as account custodian from January 1, 2004 through and including August 13, 2007. Excluded from the Class is defendant BNY and non-party Sentinel, any entity in which BNY or Sentinel has a controlling interest, or which is a parent or subsidiary of, or which is controlled by, BNY or Sentinel, BNY or Sentinel's officers and directors and any members of their immediate families, and BNY or Sentinel's affiliates, legal representatives, heirs, predecessors, successors, or assigns.

20. The Class is so numerous that joinder of all its members is impracticable.

21. Plaintiff's claims are typical of the claims of the members of the Class they seek to represent because Plaintiff and the Class sustained damages caused by BNY's conduct complained of herein.

22. Plaintiff is a representative party who will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class litigation.

Plaintiff does not have interests antagonistic to or in conflict with those of the other Class members she seeks to represent.

23. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by some individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

24. There are questions of law and fact common to the Class that predominate over any questions that may affect individual members. Among the questions of law and fact common to the Class are:

    (a) Whether BNY exercised improper control over Class members' assets to the detriment of Class members' ownership interests;

    (b) Whether BNY improperly encumbered Class members' assets;

    (c) Whether BNY breached its fiduciary duties to Class members; and

    (d) Whether the Class has suffered losses from the conduct alleged herein.

## FACTUAL ALLEGATIONS

**A.  BNY's Segregated Accounts**

25. The Class consists of Sentinel's clients - persons and entities that maintained accounts managed by the investment advisory firm Sentinel. Federal regulations promulgated under the Investment Advisers Act of 1940 prevent advisors such as Sentinel from taking direct custody of the assets that they manage, requiring instead that those assets be held by a third party known as a qualified custodian.

26. BNY was a qualified custodian under the applicable federal regulations and had exclusive custody of Class members' assets that were managed by Sentinel.

27. Sentinel made the following representation on its website: "Client assets are held in a separate custody account at [BNY] under the protection of U.S. fiduciary law. They are not assets of the bank, or subject to any claims against the bank. As client assets, they are immune from the creditors of any third party, including brokers and clearing agents. Sentinel acts solely as an agent in investing the funds. It cannot and does not have an ownership interest in the assets in custody."

28. The Investment Management Agreement ("Agreement") between Sentinel and its clients further stated that "Sentinel shall not own nor have any interest in funds or securities in the Account or of any other funds or securities in which Client has a beneficial interest." The Agreement indicated that all client assets would be aggregated with assets of other clients and deposited into segregated accounts at BNY. The Agreement specifically provided that "[a]ll Assets shall be deposited with Custodian [BNY] and held for the benefit of Client. The Custodian shall be responsible for the custody and possession of the Assets, the collection of interest, dividends and other income attributable to the Assets and the settlement of transactions."

29. Federal regulations required BNY, as a qualified custodian, to keep client assets in separate accounts from the assets of Sentinel. BNY serviced three such separate, or segregated, accounts for Sentinel's clients. The accounts were respectively referred to as SEG 1, SEG 2 and SEG 3:

   (a) SEG 1 contained assets of registered Futures Commission Merchants ("FCMs") with only domestic customer deposits;

(b)     SEG 2 contained assets of FCMs with domestic customer deposits trading in foreign markets;

(c)     SEG 3 contained assets of all other types of clients, including hedge fund managers, commodity trading advisors, currency traders, corporate treasurers, and high net-worth individuals.

30.     BNY was paid by Class members for its services by direct withdrawals from their accounts.

31.     Sentinel would manage the segregated accounts by directing the purchase and sale of assets therein. Sentinel's clients would share in the profits and losses on the investments made by Sentinel on a pro-rata basis, according to each client's proportionate share of the total assets held in the respective SEG 1, SEG 2 or SEG 3 Accounts.

32.     As one of the largest and most sophisticated qualified custodians in the world, BNY knew, or was negligent in not knowing, that federal regulations prohibit an investment advisor from having custody of client funds or securities and require client assets to be held by a qualified custodian in either: 1) a separate account under the client's name; or 2) in segregated accounts that contain only client funds.

**B.     BNY Uses Assets Belonging to Class Members as Collateral for Credit it Extends to Sentinel**

33.     Beginning no later than 2004, BNY extended to Sentinel a credit line as well as additional leveraged financing. The extension of credit from BNY to Sentinel was secured by the assets in Sentinel's "House Account." The House Account purportedly held assets owned by Sentinel and was separate from the segregated accounts.

34.     In fact, beginning no later than 2004, Sentinel would regularly engage in commingling, transferring and misappropriating its clients' assets. Sentinel would transfer assets

7

that belonged to Class members from the Segregated Accounts into its own House Account to use as collateral for credit in order to trade securities for its own financial gain.

35. By the end of the Class Period, Sentinel enjoyed a $321 million line of credit from BNY as well as additional leveraged financing. The extension of such credit was secured by the assets in Sentinel's House Account.

36. Throughout the Class Period, BNY thus extended credit to Sentinel by encumbering assets that belonged not to Sentinel but to the Class members.

37. On or about August 13, 2007, Sentinel defaulted on the credit line and/or other loans that BNY had extended to it.

38. On or about August 17, 2007, BNY informed Sentinel that, in order to satisfy the debts on which Sentinel had defaulted, it was taking steps to sell assets in Sentinel's House Account. Because the assets from the segregated accounts had been commingled with and transferred to the House Account, BNY's intention was to sell the Class members' assets in order to satisfy Sentinel's obligations to BNY.

39. BNY thus announced its intention to use Class members' assets for its own benefit, despite the fact that BNY was not a bona fide purchaser of the assets, and notwithstanding that it was on notice that the assets in Sentinel's House Account were in fact being held for third persons.

40. BNY either knew or was negligent in not knowing that the assets in the segregated accounts had been commingled with and transferred to the House Account's assets.

41. As reported in the aforementioned Barron's article, of the $800 million in assets that were purportedly held in customer segregated account SEG-3 on August 13, 2007, SEC investigators have found no more than $92 million. As a direct result of the commingling and

transfer of assets, Plaintiff and other Class members who owned assets in SEG-3 each suffered a loss of *nearly 90%* of the value of their accounts.

## CLAIMS FOR RELIEF

## COUNT I

### CONVERSION

42. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

43. As alleged herein, BNY, wrongfully without authorization, assumed control, dominion or ownership over assets held in specific and identifiable accounts that rightfully belonged to Plaintiff and the Class in derogation of the ownership rights of Plaintiff and the Class.

44. BNY used this wrongful and unauthorized control to encumber these assets improperly by subjecting them to a security agreement for loans BNY made to Sentinel.

45. These encumbrances interfered with the rights of Plaintiff and the Class members to their immediate, absolute and unconditional possession of the assets.

46. BNY's stated intent to sell the assets constituted an act claiming dominion over the assets in hostility to the rightful ownership of Plaintiff and the Class.

47. Plaintiff and the Class have made a demand for the return of their assets.

48. BNY was not a bona fide purchaser of the assets.

49. BNY's conduct caused damages to Plaintiff and the Class in an amount to be determined at trial.

## COUNT II

### NEGLIGENCE

50. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

51. By virtue of the conduct alleged herein, BNY was on notice since 2004 that Sentinel was diverting, commingling, and misappropriating assets owned by Plaintiff and the Class.

52. BNY had a duty to Plaintiff and the Class to safeguard the assets in the segregated accounts from such diversion, commingling, and misappropriation by Sentinel.

53. BNY breached this duty by not taking adequate steps to safeguard assets belonging to Plaintiff and the Class.

54. BNY's breach was the actual and proximate cause of the damages sustained by Plaintiff and the Class in an amount to be proven at trial.

## COUNT III

### BREACH OF FIDUCIARY DUTY

55. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

56. As custodian to the assets of the Plaintiff and the Class, BNY owed a fiduciary duty to Plaintiff and the Class.

57. Under this fiduciary status BNY was under a duty to act for the benefit of the Plaintiff and the Class and not profit at the expense of the Plaintiff and Class Members, and to perform their duties in good faith, loyalty and trust.

58. By virtue of the conduct alleged herein, BNY knowingly breached its fiduciary duties to Plaintiff and the Class.

59. BNY's breaches of fiduciary duty actually and proximately caused damages to Plaintiff and the Class in an amount to be proven at trial.

## COUNT IV

## UNJUST ENRICHMENT

60. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

61. By virtue of the conduct alleged herein, BNY received a benefit to the detriment the Plaintiff and the Class, and BNY's retention of that benefit violates the principles of justice, equity, and good conscience.

62. By reason of the foregoing, BNY has been unjustly enriched by an amount to be determined at trial.

63. As a result of the foregoing unjust enrichment, Plaintiff and Class members have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and those similarly situated, prays for entry of judgment as follows:

A) Certifying the Class and appointing Plaintiff and her counsel to represent it;

B) Finding that BNY's actions constitute conversion, negligence, breach of fiduciary duty, and unjust enrichment;

C) Awarding money damages to the Class;

D) Awarding reasonable attorneys' fees and costs; and

E) Granting such other relief as may be deemed just and equitable.

## JURY DEMAND

Plaintiff hereby pleads her demand for a trial by Jury.

DATED: October 10, 2007

                                          Respectfully submitted,

                                          */s/ Lori G. Feldman*

                                          **MILBERG WEISS LLP**
                                          Lori G. Feldman, (LF-3478)
                                          Neil R. Fraser, (NF-2271)
                                          William B. Scoville, Jr., (WS-1199)
                                          One Pennsylvania Plaza
                                          New York, New York 10119
                                          Tel. (212) 594-5300
                                          Facsimile: (212) 868-1229

                                          **KELLER ROHRBACK L.L.P.**
                                          Lynn Lincoln Sarko
                                          Derek Loeser
                                          Gary A. Gotto
                                          1201 Third Avenue, Suite 3200
                                          Seattle, WA 98101-3052
                                          Tel. (206) 623-1200
                                          Facsimile: (206) 623-3384

                                          *Counsel for Plaintiff*